UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x
C. MICHAEL MARTELL,                          :  No.

               Plaintiff,               :  **VERIFIED COMPLAINT**

          - vs -                      :

COHEN CLAIR LANS GREIFER          :
THORPE & ROTTENSTREICH, LLP;
ROBERT STEPHAN COHEN; and          :
SHANNON R. SIMPSON,

                                    :
               Defendants,
- - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, C. Michael Martell, by counsel, for his Verified Complaint against

Defendants Cohen Clair Lans Greifer Thorpe  & Rottenstreich, LLP, Robert Stephan Cohen, and

Shannon R. Simpson (collectively, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.. This is a diversity action seeking damages arising out of Defendants' violation

of Section 487 of the Judiciary Law of the State of New York.

2.   On or about November 19, 2013, Defendants - acting as attorneys of record

for Plaintiff's former wife in a divorce action which Plaintiff's former wife had commenced

against him in the Supreme Court of the State of New York (the "Divorce Action") - made an

application (the "Deceitful Application") to the Supreme Court of the State of New York, County

of New York (the "Divorce Court"), the court having jurisdiction over the Divorce Action, to

extend the time for Plaintiff to serve the Summons and Complaint in the Divorce Action for a

period of four months, based upon false statements contained in an affirmation intended by

Defendants to deceive the Divorce Court into believing that the request had been made in good faith and that the request, if granted, would be in the best interests of Plaintiff.

3. Based upon the Deceitful Application, the Divorce Court granted the extension of time requested by Defendants - as a consequence of which Plaintiff suffered financial damages in an amount in excess of $500,000.

## PARTIES

4. Plaintiff, C. Michael Martell ("Plaintiff"), is a natural person domiciled in the State of Maine.

5. Defendant Cohen Clair Lans Greifer Thorpe & Rottenstreich, LLP ("Def. Cohen Clair") is a partnership organized under the laws of the State of New York.

6. Defendant Robert Stephan Cohen ("Def. Cohen") is a natural person domiciled in the State of New York.

7. Defendant Shannon R. Simpson ("Def. Simpson") is a natural person domiciled in the State of New York.

## JURISDICTION AND VENUE

8. Plaintiff, C. Michael Martell, is a citizen of the State of Maine.

9. Def. Cohen Clair is a partnership organized under the laws of the State of New York and maintaining its principal office for the conduct of business in the State of New York.

10. Def. Cohen is a citizen of the State of New York.

11. Def. Simpson is a citizen of the State of New York.

12. The amount of the damages suffered by Plaintiff as a result of Defendants' attempt to deceive the Divorce Court in the Divorce Action exceeds the sum of $500,000.

13. The amount of damages suffered by Plaintiff exceeds the sum specified by 28 U.S.C. Section 1332.

14. Upon information and belief, Defendants' former client and Plaintiff's former wife, Sally Klingenstein Martell ("Ms. Klingenstein"), maintains the sum of money representing the damages suffered by Plaintiff as a result of Defendants' wrongful actions in violation of Section 487 of the Judiciary Law of the State of New York, in an account or accounts at a financial institution or financial institutions having offices for the conduct of business in the City, County, and State of New York.

15. This Court may exercise jurisdiction *in rem* or *quasi in rem* pursuant to 28 U.S.C. Section 1655.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391(b) in that Def. Cohen Clair is a partnership organized under the laws of New York and maintains its principal place of business in the judicial district of this Court; Def. Cohen resides in the judicial district of this Court; upon information and belief, Def. Simpson resides in the judicial district of this Court; and a substantial part, if not all, of the actions giving rise to Plaintiff's claim in this action occurred in the judicial district of this Court.

**FACTUAL ALLEGATION**

(1) <u>The Pre-Nuptial Agreement</u>

      17.  Plaintiff and Ms. Klingenstein were married on August 23, 2003.  Plaintiff and Ms. Klingenstein have two children, a daughter born in ▉▉▉and a son born in ▉▉▉(the "Children").

      18.  Four days prior to the marriage between Plaintiff and Ms. Klingenstein (the "Marriage"), Plaintiff and Ms. Klingenstein executed a pre-nuptial agreement (the "Pre-Nuptial Agreement").   (A copy of Pre-Nuptial Agreement is attached hereto as Exhibit "1.')

      19.  As of the date of the Marriage, Ms. Klingenstein's assets had a value of approximately $▉▉▉▉▉, and Plaintiff had a negative net worth.  Moreover, as of such time, Ms. Klingenstein was an income beneficiary and discretionary principal beneficiary of numerous family trusts holding assets with an aggregate value of more than $▉▉▉▉▉

      20.  Ms. Klingenstein's 2001 income had been approximately $▉▉▉▉ and Ms. Klingenstein's estimated income for calendar year 2002 was a similar amount.

      21.  As of the date of execution of the Pre-Nuptial Agreement, Plaintiff's sole source of income was his annual salary in the amount of $▉▉▉▉ from Frost Lighting, Inc.

      22.  The Pre-Nuptial Agreement provides, among other things, that in the event Ms. Klingenstein or Plaintiff were to commence a divorce action against the other, Ms. Klingenstein would pay to Plaintiff a distributive award in the amount of (a) $500,000 (as adjusted for increases in the cost of living ["COLA"] since August 2003) if the date of commencement were between the date of their fifth wedding anniversary and the date of their tenth wedding anniversary or (b) the sum of $1,000,000 (as increased by the COLA since August

4

23, 2003) if the date of commencement were between the date of their tenth wedding anniversary and the date of their twentieth wedding anniversary (the "Distributive Award"). (*See*, Exhibit "1" at p.9, pars [C] and [D])

23.  The Pre-Nuptial Agreement sets forth two enormously different timetables for Ms. Klingenstein's payment of the Distributive Award.

a. If Ms. Klingenstein were to commence a divorce action against Plaintiff, the Distributive Award would be payable to Plaintiff within sixty days after service of process upon Plaintiff, whereas

b. If Plaintiff were to commence a divorce action against Ms. Klingenstein, the Distributive Award would be payable to Plaintiff within ten days after entry of a judgment of divorce dissolving their marriage.

*See*, Exhibit "1" at p. 9, pars. [D] and [C].

24.  Under the terms of the Pre-Nuptial Agreement, in the event of commencement of a divorce between Ms. Klingenstein and Plaintiff, it would be in Plaintiff's financial interests if Ms. Klingenstein were to commence such action and, following such commencement, if Ms. Klingenstein were to serve process upon Plaintiff as soon as possible rather than to delay service of process until passage of 120 days following commencement of such action - the maximum period of time prescribed by New York law for service of process following commencement of a divorce action.

(2) The Separation between Ms. Klingenstein and Plaintiff

25. The marriage between Ms. Klingenstein and Plaintiff broke down irretrievably in the spring of 2013.  Effective as of that time, Ms. Klingenstein and Plaintiff

ceased to cohabit with each other in their spacious, seven bedroom Manhattan apartment (the "Marital Apt").

26. During the ensuing period of several months, Ms. Klingenstein and Plaintiff discussed the subject of divorce. However, they did not engage in negotiations, either directly or through counsel.

(3) Engagement of Matrimonial Counsel

27. In or about May, 2013, Ms. Klingenstein retained Def. Cohen Clair (then known as Cohen Clair Lans Greifer & Thorpe, LLP to represent her in connection with the impending dissolution of her marriage to Plaintiff. In mid-August 2013, Plaintiff retained William S. Beslow, Esq. ("Mr. Beslow") to represent him in connection with the impending dissolution of his marriage to Ms. Klingenstein.

28. At the time of his retention of Mr. Beslow, Plaintiff had not commenced a divorce action against Ms. Klingenstein, and Plaintiff had no understanding or information indicating that Ms. Klingenstein had commenced a divorce action against him.

29. At the time of his retention of Mr. Beslow, Plaintiff advised Mr. Beslow that Ms. Klingenstein and he had entered into a pre-nuptial agreement prior to their marriage but further advised Mr. Beslow that he did not have a copy thereof.

30. At the time of his retention of Mr. Beslow, Plaintiff knew that Ms. Klingenstein had retained Def. Cohen Clair to represent her in connection with the impending dissolution of her marriage to him, and he advised Mr. Beslow of Ms. Klingenstein's retention of Def. Cohen Clair.

31.   In or about mid-September, 2013, Mr. Beslow requested Def. Cohen to provide him with a copy of the Pre-Nuptial Agreement, and Mr. Cohen did so on September 25, 2013.

**(4) Plaintiff's Discussions with Ms. Klingenstein About her Commencement
of the Divorce Action**

32.   During September 2013, Plaintiff spoke with Ms. Klingenstein about the subject of his staying in the Marital Apt - a spacious $█████ apartment jointly owned by Ms. Klingenstein and Plaintiff - order to facilitate his spending time with the Children during his return trips to New York City from the parties' jointly owned home in Scarborough, Maine (the "Maine Home"), where Plaintiff then maintained his primary residence.  During those discussions, Ms Klingenstein told Plaintiff that there existed a court order prohibiting him from staying in the Marital Apt.

33.   As of the date of the discussions referred to in the preceding paragraph, Plaintiff did not know that Ms. Klingenstein had commenced a divorce action against him.

34.   During October 2013, Ms. Klingenstein and Plaintiff had further discussions concerning the subject of Plaintiff staying in the Marital Apt when he came to New York City to spend time with the Children.  Again, Ms. Klingenstein told Plaintiff that there existed a court order prohibiting him from staying in the Marital Apt.  In this connection, Ms. Klingenstein told Plaintiff that she had commenced a divorce action against him.   Plaintiff told Ms. Klingenstein that he had no knowledge of her commencement of a divorce against him.

35.   On November 1, 2013, Plaintiff met with Mr. Beslow.  During the course of that meeting, Mr. Beslow accessed court records on his computer.  Mr. Beslow then advised Plaintiff that there existed an action entitled "Sally Klingenstein Martell v. Christopher Michael

Martell" in the Supreme Court of the State of New York, County of New York (the "Divorce Action"). At this meeting, Mr. Beslow told Plaintiff that under New York law, Ms. Klingenstein had a period of 120 days from the date of the filing of the Summons with Notice (or Summons without Notice and Verified Complaint as the case might be) to serve process upon him.

36. In view of the fact that Ms. Klingenstein's obligation to pay the Distributive Award would be $500,000 (as adjusted for a COLA) if she commenced a divorce action against Plaintiff prior to their tenth wedding anniversary on August 23, 2013 or $1,000,000 (as adjusted for a COLA) if she commenced a divorce action against Plaintiff after their tenth wedding anniversary on August 23, 2013, Plaintiff presumed that in order to protect her financial interests, Ms. Klingenstein had commenced the Divorce Action prior to August 23, 2013.

37. In view of the provisions of the Pre-Nuptial Agreement described in paragraph 23(a) above, it was decidedly and clearly in Plaintiff's financial interests for Ms. Klingenstein to serve process upon him as soon as possible, as Ms. Klingenstein's obligation to pay him the Distributive Award would arise on the sixtieth day following service of process.

38. By reason of Plaintiff's discovery of Ms. Klingenstein's commencement of the Divorce Action and the provisions of the Pre-Nuptial Agreement described in paragraph 23(a) above, in early November 2013, Plaintiff spoke with Ms. Klingenstein about the service of process upon him, inviting (if not trying to persuade) Ms. Klingenstein to serve him with process and conveying to her his understanding that the pertinent provisions of New York law required her to serve him with process within 120 days of the date of commencement of the Divorce Action. Ms. Klingenstein did not respond to Plaintiff.

(5) The Non-Existence of Settlement Negotiations as of November 18, 2013

39. As of November 18, 2013, there were no settlement negotiations between Ms. Klingenstein and Plaintiff, directly or indirectly through their counsel. As of that date, neither Ms. Klingenstein nor her counsel had provided any financial information to Plaintiff or his counsel, other than Def. Cohen's transmission of a copy of the Pre-Nuptial Agreement to Mr. Beslow on September 25, 2013.

40. As of November 18, 2013, the only substantive contacts between counsel for Ms. Klingenstein and counsel for Plaintiff were (a) a perfunctory five-minute discussion between Def. Cohen and Mr. Beslow on November 1, 2013, following a previously scheduled meeting between them on another case and (b) a telephone conversation and e-mail exchange between Def. Cohen and Mr. Beslow on November 1, 2013 relating to the subject of Plaintiff's staying in the Marital Apt.

41. As of November 18, 2013, there had been no settlement negotiations between Ms. Klingenstein and Plaintiff.

(6) Plaintiff's Frequent Stays in New York City During the Period Between the Date of Commencement of the Divorce Action on July 30, 2013 and November 18, 2013

42. Ms. Klingenstein commenced the Divorce Action on July 30, 2013 by causing the filing of a Summons and Complaint in the Office of the Clerk of New York County. Thus, the 120-day period for service of the Summons and Complaint upon Plaintiff would expire on November 27, 2013.

43. Plaintiff was physically present in Manhattan during the period between July 30, 2013, the date of commencement of the Divorce Action, and November 18, 2013.

44. The frequency of Plaintiff's stays in Manhattan during the foregoing period – stays known to Ms. Klingenstein because Plaintiff exercised parental access with the Children during each such stay - included the following periods:

> 07/30/13 – 08/04/13
>
> 08/13/13 – 08/14/13
>
> 09/08/13 – 09/11/13
>
> 09/30/13
>
> 10/31/13 – 11/1/13

Plaintiff was also physically present in Manhattan - in order to exercise parental access with the Children, with the knowledge of Ms. Klingenstein - during the period from November 19, 2013 through November 21, 2013.

45. By reason of Plaintiff's frequent stays in Manhattan during the period from July 30, 2013 through November 18, 2013, Ms. Klingenstein easily could have caused service of the Summons and Complaint upon Plaintiff in Manhattan prior to November 18, 2013.

46. For a substantial portion of the period between July 30, 2013 and November 18, 2013, Plaintiff was physically present in the parties' home situated in Scarborough, Maine (the "Maine Home"), a fact known to Ms. Klingenstein by reason of Plaintiff's engagement in frequent telephone communications between Plaintiff and Ms. Klingenstein and between Plaintiff and one or both of the Children.  Ms. Klingenstein easily could have caused service of the Summons and Complaint upon Plaintiff at the Maine Home or at the office of Plaintiff's business, New England Audio Tech, LLC ("NEAT"), located at 11 Industrial Way, Atkinson, New Hampshire (which address was known to Ms. Klingenstein by reason of her marriage to Plaintiff

and her indirect, partial ownership interest in NEAT - the majority interest in which Plaintiff

owned) during the period between July 30, 2013 and November 18, 2013.

47. Because service of process upon him would have been in Plaintiff's financial

interests, Plaintiff would have happily authorized Mr. Beslow to accept service of process on his

behalf or agreed to make himself available to receive service of process.

48. Upon information and belief, during the period between July 30, 2013 and

November 18, 2013, Ms. Klingenstein made no effort to cause service of the Summons and

Complaint upon Plaintiff.

49. Upon information and belief, Ms. Klingenstein's failure to make an effort to

cause service of the Summons and Complaint upon Plaintiff during the period from July 30,

2013 through November 18, 2013 was in accord with and on the basis of advice rendered on

her behalf (upon information and belief, without Ms. Klingenstein's knowledge) by Def. Cohen

Clair, Def. Cohen, and Def. Simpson, advice which – as described below – was conceptualized

and later activated by Def. Cohen Clair, Def. Cohen, and Def. Simpson (upon information and

belief, without Ms. Klingenstein's knowledge, consent, authorization, or approval) so as to try

to apply improper financial pressure against Plaintiff in order (a) to foreclose Plaintiff from

engaging in litigation to protect his financial interests in the Divorce Action and (b) to leverage

Plaintiff into settling the financial issues in the Divorce Action on terms enormously unfavorable

to him.

(7) The Disingenuous "Playbook" Constructed by Def. Cohen Clair, Def. Cohen, and
     Def. Simpson

50. Ms. Klingenstein is a member of the Klingenstein family, a renowned family

in philanthropic, social, and financial circles.  As of July 30, 2013, Ms. Klingenstein had a

beneficial interest in several trusts created by members of the Klingenstein family (collectively, the "Klingenstein Family Trusts"), the aggregate principal value of which then exceeded $██████ ███, and she received from several of the trusts comprising the Klingenstein Family Trusts annual distributions of approximately $1 Million.

51. As of July 30, 2013, Plaintiff's financial circumstances were precarious. Plaintiff's business, NEAT - a full-service concert and touring production company that also specializes in corporate special events, consulting, and installations - was generating losses, not profits.

52. As of July 30, 2013, Ms. Klingenstein and, upon information and belief, Def. Cohen Clair, Def. Cohen, and Def. Simpson, understood that NEAT was generating losses, not profits.

53. As of July 30, 2013, Plaintiff's liquid assets had a value of approximately $█████ – upon information and belief, a fact known to Ms. Klingenstein and, upon information and belief, a fact known to Def. Cohen Clair, Def. Cohen, and Def. Simpson.

54. As of July 30, 2013, the cashflow from NEAT was cyclical and Ms. Klingenstein knew, based upon financial information available to her and her awareness of Plaintiff's past business practice, that during the ensuing period of not fewer than six months, the cashflow from NEAT would be insufficient to source payments to Plaintiff. Upon information and belief, Ms. Klingenstein shared her knowledge with Def. Cohen Clair, Def. Cohen, and Def. Simpson.

55. As of July 30, 2013, Ms. Klingenstein knew that Plaintiff's source of cashflow was, and would continue to be, insufficient to enable him to pay his reasonable living expenses,

including the carrying costs in connection with the Maine Home. Upon information and belief, Ms. Klingenstein shared her knowledge with Def. Cohen Clair, Def. Cohen, and Def. Simpson.

56. For a period of several years prior to July 30, 2013, (a) Ms. Klingenstein had transferred to Plaintiff, from distributions made to her by several of the trusts comprising the Klingenstein Family Trusts, the sum of $10,000 each month (the "$10,000 Monthly Support Payments") in order to help enable Plaintiff to pay his reasonable living expenses and (b) Ms. Klingenstein paid for additional living expenses incurred by Plaintiff through his use of credit cards attached to accounts in her name. Upon information and belief, on or before July 30, 2013, Ms. Klingenstein communicated these facts to Def. Cohen Clair, Def. Cohen, and Def. Simpson.

57. As of August 1, 2013, Ms. Klingenstein ceased to make the $10,000 Monthly Support Payments and peremptorily cut-off Plaintiff's right to use the credit cards that he had previously used to pay a portion of his living expenses. Upon information and belief, Ms. Klingenstein took these actions based upon advice rendered or instructions given to her by Def. Cohen Clair, Def. Cohen and Def. Simpson.

58. As of July 30, 2013 and throughout the period from July 30, 2013 through November 18, 2013, Def. Cohen Clair, Def. Cohen, and Def. Simpson had sound reason to believe that (a) Plaintiff lacked the financial capability to pay for all of his reasonable living expenses, (b) Plaintiff lacked the financial capability to incur and pay for substantial legal fees in asserting his rights relating to issues concerning the Children and concerning financial issues arising out of his marriage to Ms. Klingenstein, (c) if Ms. Klingenstein were to serve the Summons and Complaint upon Plaintiff within the 120-day period following commencement of

the Divorce Action, as prescribed by New York law, she would be obligated to pay Plaintiff a Distributive Award in the amount of $500,000 (as increased by COLA) within 60 days after such service, resulting in Plaintiff having the funds to live comfortably and to compensate his counsel during any period of negotiations or litigation relating to or arising out of the Divorce Action.

59. Def. Cohen Clair, Def. Cohen, and Def. Simpson designed a strategy or playbook (upon information and belief, without Ms. Klinlgenstein's approval, knowledge, or agreement) consisting of two plays: (a) commencement of a divorce action prior to Ms. Klingenstein and Plaintiff's tenth wedding anniversary so as to limit the Distributive Award payable to Plaintiff to $500,000 (as increased by COLA) and (b) delay of service of process in such divorce action for as long a period of time as possible, in order to create financial leverage in favor of Ms. Klingenstein which, as furthered by aggressive actions which Def. Cohen Clair, Def. Cohen, and Def. Simpson intended to implement against Plaintiff, would be sufficiently powerful so as to cause Plaintiff to be unable to litigate issues in the Divorce Action and, consequently, to pressure Plaintiff to acquiesce in unreasonable settlement demands which they intended to present to counsel for Plaintiff as soon as they were in a position to assert such leverage (the "Playbook").

60. Def. Cohen Clair, Def. Cohen, and Def. Simpson carried out the Playbook (upon information and belief, without Ms. Klingenstein's approval, knowledge, or agreement), a central feature of which was to deceive the Divorce Court by seeking to enlarge the 120-day period of time for Ms. Klingenstein to serve the Summons and Complaint upon Plaintiff based upon a false, dishonest representation - to be made by Def. Simpson under the penalties of perjury - that Ms. Klingenstein sought such enlargement out of a purported concern that

service of process would distress Plaintiff and, thus, jeopardize and/or undermine the

settlement process which had yet to begin.

(8) Def. Simpson's Disingenuous, Dishonest, Misleading, and Deceptive Statements
to the Divorce Court to Persuade it to Grant the Deceitful Application for
Issuance of an *Ex Parte* Order Enlarging Ms. Klingenstein's Time to Serve Process
<u>In the Divorce Action Upon Plaintiff for an Additional Period of 120 Days</u>

61. On January 15, 2014, Plaintiff met with Mr. Beslow in Mr. Beslow's office.

During the course of the meeting, Mr. Beslow telephoned Def. Simpson to confirm that Ms.

Klingenstein had commenced a divorce action against Plaintiff.

62. As of such date, service of process was (a) overdue, in the event Ms.

Klingenstein had commenced a divorce action against Plaintiff prior to September 17, 2013, (b)

not yet due, in the event Ms. Klingenstein had commenced a divorce action against Plaintiff

subsequent to September 17, 2013, or (c) due on that very date, in the event Ms. Klingenstein

had commenced a divorce action against Plaintiff on September 17, 2013.

63. Upon information and belief, Def. Simpson told Mr. Beslow that Ms.

Klingenstein had commenced a divorce action against Plaintiff, that Ms. Klingenstein had

applied to the Supreme Court of the State of New York, County of New York (the "Divorce

Court") for an *ex parte* order extending Ms. Klingenstein's time to serve process upon Plaintiff,

and that the Divorce Court had granted Ms. Klingenstein's application.

64. Following the telephone conversation between Mr. Beslow and Def. Simpson

referenced in paragraphs 62 and 63 above, Mr. Beslow forwarded to Def. Simpson an e-mail

requesting Def. Simpson to provide him that day with (a) a copy of the Summons and Complaint

filed by Def. Cohen Clair on behalf of Ms. Klingenstein in the Divorce Action, (b) a copy of the

papers filed in support of Ms. Klingenstein's application for issuance of an *ex parte* order

enlarging her time to serve process upon Plaintiff in the Divorce Action, and (c) a copy of the *ex parte* order issued by the Divorce Court.

65. Later that day, Mr. Beslow forwarded to Def. Cohen an e-mail repeating the request contained in his e-mail to Def. Simpson described in paragraph 64 above.

66. Def. Simpson failed to respond to the e-mail which Mr. Beslow sent to her, and Def. Cohen failed to respond to the e-mail which Mr. Beslow sent to him.

67. As a result of the failure by Def. Simpson and Def. Cohen to respond to Mr. Beslow's emails, on the following day - January 16, 2014 - Plaintiff and Mr. Beslow traveled to the Divorce Court so that Plaintiff (who had not yet been served with process in the Divorce Action, thus foreclosing his attorney, Mr. Beslow, from inspecting any documents filed on behalf of Ms. Klingenstein in the Divorce Action because Mr. Beslow was not "counsel of record" and, consequently, could not lawfully access documents filed in the Divorce Action) could requisition the file in the Divorce Action ("the Divorce Action File") and, thereupon, review with Mr. Beslow the original documents a copy of which Mr. Beslow had requested Def. Simpson and Def. Cohen to send to him.[1]

68. As of January 16, 2014, the Divorce Action File contained the following documents: (a) Summons dated July 30, 2013 and Complaint, sworn to by Ms. Klingenstein on July 29, 2013, (b) Affirmation of Def. Simpson, dated November 18, 2013 (the "Simpson Aff."); and (c) *ex parte* order dated November 21, 2013 (the "*Ex Parte* Order") enlarging Ms.

---

[1] Subsequent to Plaintiff and Mr. Beslow traveling to the Divorce Court to inspect the Divorce Action File on January 16, 2014, Def. Simpson forwarded to Mr. Beslow the documents he had requested in his e-mail to Def. Simpson dated January 15, 2014.

Klingenstein's time to serve process upon Plaintiff for an additional period of 120 days, measured from November 27, 2013, signed by Hon. Martin Schoenfeld ("Judge Schoenfeld").

69. As described below, the Simpson Aff. was disingenuous, dishonest, deceptive, and misleading insofar as it failed to disclose critically important facts which, if disclosed, would likely have caused Judge Schoenfeld not to issue the *Ex Parte* Order because the application filed by Def. Cohen Clair on behalf of Ms. Klingenstein was based upon the dishonest and false representation contained in the Simpson Aff. that service of process upon Plaintiff would disturb or upset Plaintiff and, thus, would jeopardize or undermine negotiations between Ms. Klingenstein and Plaintiff as to resolution of the issues arising out of the Divorce Action.

(a) The Attempt to Deceive the Divorce Court By the
Purposeful Omission of Relevant Facts

70. The foundation of the argument contained in the Simpson Aff. is Def. Simpson's purposeful omission of the following facts in furtherance of the intention by Def. Cohen Clair, Def. Cohen, and Def. Simpson to deceive the Divorce Court into believing that extension of the 120-day period prescribed by law would be in the best interests of Plaintiff:

a. Ms. Klingenstein could easily have served process in the Divorce Action upon Plaintiff during the 110-day period between July 30, 2013 and November 18, 2013 (the date Def. Simpson signed the Simpson Aff.), since Plaintiff was often physically present in Manhattan during that period to exercise parental access with the Children, with the knowledge of Ms. Klingenstein;

b. Ms. Klingenstein had made no effort to cause service of process in the Divorce Action upon Plaintiff during the period between July 30, 2013 and November 18, 2013;

c. During the period between July 30, 2013 and November 18, 2013, Def. Cohen Clair, Def. Cohen, and Def. Simpson had not disclosed to Mr. Beslow that Ms. Klingenstein had commenced the Divorce Action;

d. During the period between July 30, 2013 and November 18, 2013, Def. Cohen Clair, Def. Cohen, and Def. Simpson did not request Mr. Beslow to accept service of process in the Divorce Action on behalf of Plaintiff or to take any steps to facilitate service of process in the Divorce Action upon Plaintiff;

e. Service of process in the Divorce Action upon Plaintiff within the 120-day period prescribed by law would have been in Plaintiff's financial interests and there existed no reason Plaintiff would not have been happy with and pleased by Ms. Klingenstein arranging for service of process in the Divorce Action upon him.

f. Ms. Klingenstein's interests - adverse to those of Plaintiff - would be served by an enlargement of Ms. Klingenstein's time to effect service of process in the Divorce Action upon Plaintiff;

g. Service of process in the Divorce Action upon Plaintiff would start the clock on a 60-day period within which Ms. Klingenstein would have the obligation to pay Plaintiff the sum of $500,000 (as increased by COLA), pursuant to the terms of the Pre-Nuptial Agreement, which agreement is not attached to the Complaint or the Simpson Aff., thus preventing Judge Schoenfeld from reading the Pre-Nuptial Agreement and making an informed judgment - based upon the express terms of the Pre-Nuptial Agreement – that the application filed by Def. Cohen Clair on behalf of Ms. Klingenstein was disingenuous, dishonest, misleading, and deceptive and, accordingly, that it should be denied;

h. (i) Ms. Klingenstein was enormously wealthy; (ii) Ms. Klingenstein had cut-off the $10,000 Monthly Transfers to Plaintiff; (iii) Ms. Klingenstein had cut-off Plaintiff's right to charge a portion of his living expenses against credit card accounts in Plaintiff's name; (iv) Plaintiff had only *de minimis* liquid assets; and (v) NEAT, Plaintiff's sole source of income, was then experiencing a substantial cashflow shortfall;

i. As of November 18, 2013, (i) there had been no negotiations between Ms. Klingenstein and Plaintiff or between Ms. Klingenstein's counsel and Plaintiff's counsel and (ii) neither Ms. Klingenstein nor Plaintiff - directly or through counsel - had made a settlement proposal or, indeed, had even produced any financial information for consideration by the other in reaching an informed judgment as to settlement of the financial issues arising out of the marriage between Ms. Klingenstein and Plaintiff.

j. Upon information and belief, the underlying purpose of the application made by Def. Cohen Clair on behalf of Ms. Klingenstein was (i) to obviate the likelihood that Ms. Klingenstein's transfer of $500,000 (as increased by COLA) to Plaintiff would provide Plaintiff with funds which he could use to support himself and to compensate his counsel for all reasonable legal fees incurred by him in connection with the negotiation of a fair settlement of all issues arising out of the marriage between Ms. Klingenstein and Plaintiff or, in the absence of a negotiated settlement, in connection with the litigation of the Divorce Action and (ii) to enable Def. Cohen Clair, Def. Cohen, and Def. to exert financial pressure against Plaintiff in order to coerce him into acquiescing in a settlement of financial issues arising out of the marriage between Ms. Klingenstein and Plaintiff on terms which would provide Plaintiff with

substantially less property than he would otherwise be entitled to receive and, thus, a settlement which would be contrary to his best interests.

71. Having purposefully withheld from the Divorce Court the facts contained in paragraph 70 above, the Simpson Aff. stated only the following which - leaving aside the purposeful omission of the facts contained in paragraph 70 above - was, in and of itself, disingenuous, dishonest, misleading, and deceptive and designed to cause the Divorce Court to believe that its granting the *ex parte* application filed by Def. Cohen Clair on behalf of Ms. Klingenstein would be a benign act in the best interests of both Ms. Klingenstein and Plaintiff:

> The parties have been attempting to resolve issues with respect to custody of their two children as well as *any* financial obligations between them (Emphasis added)

> This extension of time is respectfully requested *so that the parties may continue their efforts to resolve the dissolution of their marriage without litigation* (Emphasis added)

> It is our (and our client's hope) that the *best chance* for a non-litigated settlement and the most amicable resolution possible will be *enhanced* by receipt of the requested extension (Emphasis added)

72. Upon information and belief, at the time Def. Simpson signed the Simpson Aff., Def. Simpson knew that the statements described in paragraph 71 were disingenuous and untrue; Def. Cohen knew that the statements contained in paragraph 71 were disingenuous and untrue; and Ms. Klingenstein was unaware of the statements contained in paragraph 71 and, moreover, was unaware of the statements contained in paragraph 71.

73. Upon information and belief, at the time Def. Simpson submitted the Simpson Aff. to the Divorce Court, (a) Def. Cohen Clair, Def. Cohen, and Def. Simpson intended

to deceive the Divorce Court into believing that Ms. Klingenstein intended to make a *bona fide* proposal to settle financial issues arising out of the marriage between Plaintiff and her, and (b) Def. Cohen Clair, Def. Cohen, and Def. Simpson had sound reason to believe that "the most amicable resolution possible" would *not* be enhanced "by [Ms. Klingenstein's] receipt of the requested extension."

74. Upon information and belief, as of the date of issuance of the *Ex Parte* Order, Def. Cohen Clair, Def. Cohen, and Def. Simpson determined – without Ms. Klingenstein's knowledge, approval, or agreement - that they would use the additional four-month period of time to serve the Summons and Complaint upon Plaintiff (through March 27, 2014) to leverage Plaintiff into resolving all financial issues arising out of his marriage to Ms. Klingenstein on terms that would be enormously unfair to him.

(b) Objective, Irrefutable Evidence Showing the Intent of
Def. Cohen Clair, Def. Cohen, and Def. Simpson to
Deceive the Divorce Court

75. Within two weeks of the date of issuance of the *Ex Parte* Order, Def. Cohen forwarded to Mr. Beslow a letter containing a settlement proposal on behalf of Ms. Klingenstein (the "Bad Faith Proposal"). The relevant provisions of the Bad Faith Proposal are as follows:

(i) Def. Cohen represented falsely that the equity in the Marital Apt was only $4 Million and, accordingly, represented falsely that pursuant to the terms of the Pre-Nuptial Agreement Plaintiff would be entitled to a distributive award of only $2 Million with respect to the Marital Apt;

(ii) Def. Cohen represented falsely that under paragraph 9.3(C) of the Pre-Nuptial Agreement, Plaintiff would be entitled to a distributive award of $500,000 [not $1.0 Million], subject to COLA provided for in paragraph 9.3(F) of the Pre-Nuptial Agreement with respect to the Marital Apt, because Ms. Klingenstein and Plaintiff had "separated after their fifth wedding anniversary but prior to their tenth [wedding] anniversary."

(iii) Def. Cohen stated that Ms. Klingenstein, Def. Cohen Clair, and he expected Plaintiff to "cooperate with [Ms. Klingenstein] in meeting his obligation to repay to Ms. Klingenstein the "$4 million in loans" which Ms. Klingenstein had made to NEAT - a false statement insofar as Ms. Klingenstein had not made $4 Million in loans to NEAT.

76. Leaving aside the value, if any, of NEAT and the value of articles of tangible personal property owned by Ms. Klingenstein and Plaintiff, the Bad Faith Proposal provided that

(i) Plaintiff would receive the (1) sum of $500,000 (as increased by COLA in the amount of $151,512) for the distributive award relative to the Marital Apt, (2) the sum of $2 Million, representing his one-half share of the alleged $4 Million in equity in the Marital Apt, and (3) one-half of the value of the real property owned by Ms. Klingenstein and Plaintiff in the State of Maine [having a value of approximately $1.5 Million] for a total of approximately $3,375,000 *but*

(ii) In a transaction related to but technically independent of settlement of the Divorce Action, Plaintiff would repay to Ms. Klingenstein the "$4 Million in loans" which Ms. Kingenstein had allegedly made to NEAT.

77. Thus, the Bad Faith Proposal provided for Plaintiff to receive (leaving aside the value, if any, of NEAT and the value of a one-half interest in the articles of tangible personal

property owned by Ms. Klingenstein and Plaintiff, collectively the "Other Property") an award of cash and property having a value of approximately $3,375,000 but to repay "the $4 Million in loans" which Ms. Klingenstein had allegedly made to NEAT.

78. Under the Bad Faith Proposal, leaving aside the value of the Other Property, Plaintiff would receive cash and property having a value of approximately $3,375,000 but would undertake to pay to Ms. Klingenstein the sum of $4,000,000.

79. Thus, the net effect of the Bad Faith Proposal was that leaving aside the value of the Other Property which Plaintiff would retain, Plaintiff would have a net liability of $625,000; *i.e.*, $3,375,000 cash and property received, as reduced by a $4,000,000 payment to Ms. Klingenstein.

80. That the Bad Faith Proposal was enormously and outrageously unreasonable is illustrated and proven conclusively by the fact that on April 10, 2015, when Ms. Klingenstein and Plaintiff settled all issues arising out of the Divorce Action and all issues related to the alleged "$4 million in loans" which Ms. Klingenstein had - according to Def. Cohen - made to NEAT, leaving aside the value of NEAT (of which Plaintiff received sole ownership) and the value of the articles of tangible personal property owned by Ms. Klingenstein and Plaintiff, which they agreed to divide equitably between them, Plaintiff received cash and property having an aggregate value in excess of $6,250,000.

81. That Def. Cohen Clair, Def. Cohen, and Def. Simpson intended to deceive the Divorce Court into issuing the *Ex Parte* Order in order to leverage Plaintiff into entering into an enormously one-sided, unfair, and unreasonable, and unconscionable settlement agreement by delaying, for as long as possible, Plaintiff's receipt of the $500,000 distributive award (as

increased by COLA) provided for in the Pre-Nuptial Agreement, thereby interfering with and undermining Plaintiff's capability to pay his reasonable living expenses and to pay his reasonable attorneys' fees incurred in the Divorce Action, is further illustrated by Ms. Klingenstein's ensuing course of conduct vis-à-vis NEAT - upon information and belief, conceived, orchestrated, and implemented by Def. Cohen Clair, Def. Cohen, and Def. Simpson, with the assistance of outside counsel - the purpose of which was to force NEAT out of business based upon the false assertion that Ms. Klingenstein had made "$4 million in loans" to NEAT, evidenced by a purported note dated as of March 1, 2005 and that Ms. Klingenstein had the right to sue NEAT for  payment of such loans.

82. As of February 3, 2014, Plaintiff had not responded to the Bad Faith Proposal, except insofar as by email written in January 2014, Mr. Beslow requested Def. Simpson to produce a copy of documents relative to the loans allegedly made to Ms. Klingenstein by one or more of the Klingenstein Family Trusts, related to the purchase of the Marital Apt which, according to Def. Cohen and Def. Simpson, reduced the equity in the Marital Apt for the purpose of the calculation of the value thereof subject to division between Ms. Klingenstein and Plaintiff pursuant to and in accord with paragraph 9(C) of the Pre-Nuptial Agreement.

83. Upon information and belief, upon the advice of, in concert with, or at the request of, Def. Cohen Clair, Def. Cohen, and Def. Simpson, on February 3, 2014, the law firm Pierce Atwood LLP - acting on behalf of Ms. Klingenstein, pursuant to a retainer agreement between such law firm and Ms. Klingenstein signed by such law firm and Ms. Klingenstein, upon information and belief, in December 2013 - forwarded to NEAT a **DEMAND FOR PAYMENT** (the "Demand Letter"), stating in part as follows:

This firm represents Sally Klingenstein Martell, the current holder of a certain Demand Note dated as of March 1, 2005 in the original principal amount of $4,000,000 (the "Note"), given by New England Audio Tech, LLC (the "Borrower").

Demand is hereby made upon New England Audio Tech, LLC for the full and immediate payment of all amounts due and owing under the Note which, as of January 31, 2014, are as follows: outstanding principal of $4,000,388.13, and accrued Interest of $1,042,520.97, for a total outstanding balance of $5,042,909.10[2]

84. Upon information and belief, the purpose of the Demand Letter was to apply pressure against Plaintiff - through the threat of foreclosing on the Note and, consequently, driving NEAT out of business, since it was then operating at a loss - to acquiesce in the Bad Faith Proposal.

85. Upon information and belief, at the time of issuance of the Demand Letter, Def. Cohen Clair, Def. Cohen, and Def. Simpson intended the Demand Letter to apply pressure against Plaintiff - through the threat of Ms. Klingenstein foreclosing on the Note and, consequently, driving NEAT out of business - to induce him to acquiesce in the Bad Faith Proposal.

86. As of February 3, 2014, the Note referred to in the Demand Letter did not exist (except in draft form) by reason of the fact - upon information and belief, unknown to Ms.

---

[2] The total outstanding balance is based on presently available information. Ms. Martell reserves the right to amend the amount indicated above to include the full amount of the Borrower's debt to Ms. Martell. In addition, the Borrower's records with respect to the loan from Ms. Martell show an inconsistency of $635,688.40. The above outstanding balance does not include this figure. Ms. Martell reserves the right to claim the additional $635,688.40 upon further review of the relevant financial records.

Klingenstein at such time but known to Def. Cohen Clair, Def. Cohen, and Def. Simpson at such time - that no one had ever signed it on behalf of NEAT.

87. Upon information and belief, as of December 4, 2013, when Def. Cohen wrote and forwarded the letter containing the Bad Faith Proposal, and as of February 3, 2014, when Pierce Atwood LLP issued the Demand Latter, Def. Cohen Clair, Def. Cohen, and Def. Simpson knew that no one had ever signed the Note on behalf of NEAT and, thus, that the Note was not a legally binding document but, rather, was a legal nullity. (Hereinafter, the "Note" will be referred to as the "Bogus Note.")

88. NEAT did not respond to the Demand Letter.

89. On or about May 16, 2014, Ms. Klingenstein commenced an action against NEAT in the Superior Court of the County of Rockingham County, State of New Hampshire, for breach of contract based on NEAT's failure to make payments allegedly due Ms. Klingenstein under a purported loan agreement evidenced by the Bogus Note (the "Action on the Bogus Note").

90. Upon information and belief, Ms. Klingenstein commenced the Action on the Bogus Note (a) upon the recommendation, suggestion, advice, or opinion of Def. Cohen Clair, Def. Cohen, and Def. Simpson, (b) with the knowledge and approval of Def. Cohen Clair, Def. Cohen, and Def. Simpson, and (c) without the knowledge that the Action on the Bogus Note was baseless, both legally and factually.

91. The purpose of Ms. Klingenstein's commencement of the Action on the Bogus Note was to harass Plaintiff by forcing him to engage counsel to litigate such action and

to incur counsel fees in defending such action, notwithstanding the lack of merit therein, thereby putting additional pressure on Plaintiff to acquiesce in the Bad Faith Proposal.

92. Upon information and belief, issuance of the Demand Letter and commencement of the Action on the Bogus Note were undertaken at the suggestion of, advice of, or opinion of Def. Cohen Clair, Def. Cohen, and Def. Simpson as part of a strategy and plan - conceptualized by Def. Cohen Clair, Def. Cohen, and Def. Simpson (without Ms. Klingenstein's knowledge, approval, or agreement) not later than the date of Def. Simpson's execution of the Simpson Aff. and the submission of the Deceitful Application to the Supreme Court - to exert leverage against Plaintiff in order to pressure him into accepting an unconscionable, unreasonable, and unfair agreement settling all financial issues relating to or arising out of (a) the marriage between Ms. Klingenstein and Plaintiff and (b) NEAT's indebtedness, if any, to Ms. Klingenstein.

93. The actions of Ms. Klingenstein subsequent to November 18, 2013, described in paragraphs 75 through 92 above, all of which took place as a result of the advice, opinion, and strategy designed and effectuated by Def. Cohen Clair, Def. Cohen, and Def. Simpson further demonstrate that as of the time of Def. Simpson's execution of the Simpson Aff. and as of the time of submission of the Deceitful Application to the Divorce Court, Def. Cohen Clair, Def. Cohen, and Def. Simpson (a) intended not to enter into a good faith negotiation with Mr. Beslow, as attorney for Plaintiff, (b) intended to issue the Bad Faith Proposal promptly after issuance of the *Ex Parte* Order, (c) intended to arrange for Ms. Klingenstein to engage New Hampshire counsel to issue the Demand Letter and, thereafter, to commence the Action on the Bogus Note, and (d) intended to pursue a course of action designed to harass and coerce

Plaintiff into acquiescing in a resolution of all issues arising out of his marriage to Ms.

Klingenstein on terms that would be enormously unreasonable and unfair to Plaintiff.

(9) The $500,000 Damage Caused to Plaintiff by the Deceitful Application and
    Plaintiff's Attempt to Undo the Damage Embedded in the *Ex Parte* Order

94. Upon information and belief, during the period between November 21, 2013, the date of issuance of the *Ex Parte* Order, and November 27, 2013, the 120th day subsequent to commencement of the Divorce Action, Ms. Klingenstein made no effort to serve the Summons and Complain in the Divorce Action upon Plaintiff.

95. During the period between November 21, 2013 and November 27, 2013, Plaintiff was physically present in Boston, Massachusetts.

96. Upon information and belief, Plaintiff's whereabouts during the period between November 21, 2013 and November 27, 2013 were unknown to Ms. Klingenstein during such one-week period.

97. Upon information and belief, in the event Judge Schoenfeld had denied the Deceitful Application, Ms. Klingenstein would have been unable to serve the Summons and Complaint upon Plaintiff within the period from November 21, 2013 from November 27, 2013.

98. Upon information and belief, in the event Judge Schoenfeld had denied the Deceitful Application, the Divorce Action would have abated as of November 28, 2013 - without any action on the part of Plaintiff - or would have been subject to a motion to dismiss by reason of Ms. Klingenstein's failure to effectuate service of the Summons and Complaint upon Plaintiff within the 120-day period following commencement of the Divorce Action.

99. As shown in paragraph 36 above, in the event of the abatement or dismissal of the Divorce Action, upon commencement of another divorce action by either Ms.

Klingenstein against Plaintiff or by Plaintiff against Ms. Klingenstein (the "Second Divorce Action"), the distributive award provided for in the Pre-Nuptial Agreement would have been $1.0 Million (as increased by COLA), not $500,000 (as increased by COLA), because the date of commencement of the Second Divorce Action would have been subsequent to August 23, 2013, the tenth wedding anniversary of the marriage between Ms. Klingenstein and Plaintiff.

100. By reason of the foregoing, Plaintiff suffered damage in the amount of not less than $500,000 (as increased by COLA) as a result of issuance of the *Ex Parte* Order.

101. In order to attempt to undo the damage to him arising out of the *Ex Parte* Order, on February 7, 2014, Plaintiff moved the Divorce Court for an order vacating the *Ex Parte* Order on the ground of fraud, *i.e.*, Def. Cohen Clair, Def. Cohen, and Def. Simpson had caused Judge Schoenfeld to issue the *Ex Parte* Order on the basis of their submission of the deceitful, disingenuous, misleading, and dishonest Simpson Aff. and the Deceitful Application (the "Vacate Motion").

102. The Divorce Action and, thus, the Vacate Motion were assigned to Hon. Deborah A. Kaplan, J.S.C. ("Judge Kaplan").

103. Upon information and belief, Judge Kaplan declined to transfer the Vacate Motion to Judge Schoenfeld for determination by him.

101. Ms. Klingenstein filed papers in opposition to the Vacate Motion.

104. As a result of Judge Kaplan's decision not to transfer the Vacate Motion to Judge Schoenfeld, a decision on the Vacate Motion would not be made by Judge Schoenfeld - the only person who knew and, therefore, could rule whether the *Ex Parte* Order had been

issued as a result of the commission of fraud upon him and, thus, the Divorce Court - but by Judge Kaplan.

105. Upon information and belief, Judge Kaplan could not rule - one way or the other - whether Judge Schoenfeld would have declined to issue the *Ex Parte* Order in the event he knew that (a) the Simpson Aff. was disisngenuous, misleading, dishonest, and untruthful and (b) Plaintiff would have derived a substantial financial benefit, with no offsetting detriment, if Mr. Klingenstein served the Summons and Complaint upon him within the 120-day period following commencement of the Divorce Action.

106. Upon information and belief, as a matter of law Plaintiff's establishing that Def. Cohen Clair, Def. Cohen, and Def. Simpson had attempted to deceive the Divorce Court in submitting the Simpson Aff. and the Deceitful Application would have been insufficient to persuade Judge Kaplan to grant the Vacate Motion - as Plaintiff faced the heavy evidentiary burden of proving, by clear and convincing evidence, that Judge Schoenfeld had issued the *Ex Parte* Order as the result of fraud perpetrated upon him by Def. Cohen Clair, Def. Cohen and Def. Simpson.

107. Based upon the impossibility of prevailing on the Vacate Motion by reason of Judge Kaplan's determination not to transfer such motion to Judge Schoenfeld for determination (and leaving aside the heavy burden of proof which would be imposed upon him, as a matter of law), Plaintiff had no viable course of action but to negotiate an agreement with Mr. Klingenstein by which he would withdraw the Vacate Motion and Ms. Klingenstein would pay the $500,000 distributive award (with COLA) due him under the Pre-Nuptial

Agreement so that he would have the financial capability to support himself and to compensate his counsel in connection with and during the pendency of the Divorce Action.

107. By stipulation dated entered into on August 1, 2014, Ms. Klingenstein and Plaintiff agreed that Plaintiff would withdraw the Vacate Motion, Ms. Klingenstein would pay Plaintiff, within one day after the date of execution of such stipulation, the sum of $402,439, which, together with a $250,000 payment which Ms. Klingenstein had made to Plaintiff in mid-March 2014, pursuant to stipulation dated March 14, 2014, satisfied the $500,000 distributive award (as increased by COLA) due Plaintiff under the Pre-Nuptial Agreement, and Plaintiff would accept such payment in satisfaction of his right to receive a distributive award pursuant to paragraph 9(C) of the Pre-Nuptial Agreement.

108. Subsequent to and as a result of his receipt of the distributive award referred to in paragraph 107 above, Plaintiff had the requisite financial wherewithal to pay his reasonable living expenses and to litigate all issues arising out of the Divorce Action and the Action on the Bogus Note.

109. During the remaining months of 2014, there were no negotiations between Ms. Klingenstein and Plaintiff as to resolution of the financial issues arising out of the Divorce Action and/or the Action on the Bogus Note because Plaintiff determined not to respond to the Bad Faith Proposal until (a) his attorney in the Divorce Action had conducted sufficient pre-trial discovery to demonstrate the baselessness of the Bad Faith Proposal, as well as to establish his rights under the Pre-Nuptial Agreement, and (b) his attorney in the Action on the Bogus Note had conducted pre-trial discovery to demonstrate that such action was baseless and frivolous, especially by reason of the fact that no one have ever signed the Bogus Note on behalf of NEAT.

110. By the late winter of 2014-2015, Plaintiff had established the baselessness of both the Bad Faith Proposal and the Action on the Bogus Note., as well as his rights under the Pre-Nuptial Agreement. As a result, negotiations as to resolution of the financial issues arising out of the Divorce Action began - for the first time.

(10) The Settlement Agreement and Plaintiff's Reservation of the Right to Make Claims Against Def. Cohen Clair, Def. Cohen, and Def. Simpson, Including a Claim for Treble Damages Under Judiciary Law Section 487

108. On April 10, 2015, Ms. Klingenstein and Plaintiff settled, as between them, all financial issues arising out of their marriage, including Ms. Klingenstein's purported, but non-existent, rights under the Bogus Note.

109. As and for settlement of all financial issues arising out of both actions, and leaving aside the division of the articles of tangible personal property acquired by Ms. Klingenstein and Plaintiff during the parties' marriage, Plaintiff received:

a. The Distributive Award in the amount of $500,000 (as increased by COLA), payment of which had already been made to Plaintiff pursuant to stipulations dated March 14, 2014 and August 1, 2014);

b. A further distributive award of $4.4 Million;

c. Ownership of the Maine Home, as well as a parcel of land owned by Ms. Klingenstein, having an aggregate, approximate fair market value of $1.25 Million.

110. In addition to the benefits conferred upon Plaintiff referred to in paragraph 109 above, (a) Plaintiff retained his ownership interest in NEAT, (b) Plaintiff received from Ms. Klingenstein her ownership interest in Key Lighting, LLC, which then held an equity interest in

NEAT, and (c) Ms. Klingenstein undertook to discontinue the Action on the Bogus Note with prejudice and to deem the Bogus Note to be fully satisfied.

111. Thus, the settlement reached by Ms. Klingenstein and Plaintiff conferred upon Plaintiff cash and property having a value in excess of $6,250,000 - a value which took into account the facts that (a) there was some value in Ms. Klingenstein's ownership interest in Key Lighting, LLC and (b) although Ms. Klingenstein had never made "$4.0 Million in loans" to NEAT, in a series of more than 20 transactions during the period from 2005 through 2008, Ms. Klingenstein had transferred the aggregate sum of approximately $1.5 Million to NEAT, which NEAT's general ledger recorded as loans (the "Presumptive Loans")

112. But for Plaintiff's recognition of the Presumptive Loans, the additional distributive award to Plaintiff would have been substantially in excess of $5.0 Million and, thus, the value of the cash and property which Plaintiff would have retained and/or received in resolution of the financial issues arising out of the Divorce Action and the Action on the Bogus Note would have exceeded $7.0 Million.

113. The terms of the settlement reached between Ms. Klingenstein and Plaintiff demonstrate the accuracy of Plaintiff's characterization of Def. Cohen's December 4, 2013 proposal as the "Bad Faith Proposal" and the application made by Def. Cohen Clair, Def. Cohen, and Def. Simpson, on behalf of Ms. Klingenstein to the Divorce Court for enlargement of Ms. Klingenstein's time to serve process in the Divorce Action for an additional period of 120 days (until March 27, 2014) as the "Deceitful Application."

114. The Settlement Agreement contains no provision by which Plaintiff releases

Def. Cohen Clair, Def. Cohen, or Def. Simpson from any liability to him arising out of their

wrongful acts described above.

(11) Def. Cohen Clair, Def. Cohen, and Def. Simpson Have Violated Section 487 of the New York
Judiciary Law and Plaintiff is Entitled to Recover Treble Damages from Them

115. New York Judiciary Law Section 487 provides as follows:

An attorney or counselor who:

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion,
with intent to deceive the court or any party, or

2. Willfully delays his client's suit with a view to his own gain; or, willfully
receives any money or allowance for or on account of any money which
he has not laid out, or becomes answerable for

Is guilty of a misdemeanor, and in addition to the punishment prescribed
therefor by the penal code, he forfeits to the party injured treble
damages, to be recovered in a civil action.

116. As a matter of law, an attempt by an attorney or counselor to deceive a

court violates Section 487 of the Judiciary Law, even if such attempt is unsuccessful. (*See,*

*Amalfitano v. Rosenberg,* 12 N.Y.3d 8 (2009); *see also*, *Amalfitano v. Rosenberg*, 572 F.3d 91

(2009); 533 F.3d 117 (2nd Cir. 2008); and 428 F. Supp. 196 (S.D.N.Y. 2006).

117. The foregoing paragraphs of this Complaint show that Def. Cohen Clair, Def.

Cohen, and Def. Simpson submitted the Simpson Aff. and the Deceitful Application to the

Divorce Court with the intent to deceive it into issuing the *Ex Parte* Order based upon the

untruthful statements that service of process upon Plaintiff would threaten or undermine

settlement negotiations between Ms. Klingenstein and Plaintiff and that enlargement of Ms.

Klingenstein's time to serve process upon Plaintiff in the Divorce Action would be in Plaintiff's best interests, as well as in the best interests of Ms. Klingenstein.

118. In the event Judge Schoenfeld had rejected the Deceitful Application, Ms. Klingenstein would have been unable to serve process in the Divorce Action upon Plaintiff on or before November 27, 2013, the 120th day after commencement of the Divorce Action and, consequently, upon commencement of the Second Divorce Action, the Distributive Award payable to Plaintiff would have been $1 Million (as increased by COLA), not $500,000 (as increased by COLA).

119. Thus, the damage suffered by Plaintiff - $500,000 (as increased by COLA) and legal fees incurred by Plaintiff in making the Vacate Motion - was the proximate result of Defendants' violation of New York Judiciary Law Section 487.

WHEREFORE, Plaintiff demands judgment against Defendants in the amount of more than $1,500,000; *i.e.,* (a) $500,000 (as increased by COLA) and counsel fees incurred by Plaintiff in connection with the Vacate Motion) multiplied by 3, pursuant to the provisions of New York Judiciary Law Section 487, and (b) counsel fees incurred by Plaintiff in connection with this action.

Dated: New York, New York
      October 18, 2018

William S. Beslow, Esq.
Attorney for Plaintiff
623 Fifth Avenue
New York, NY 10022

# VERIFICATION

C. MICHAEL MARTELL, declares under penalty of perjury of the laws of the United States of America that I am the Plaintiff in this action; that I have personal knowledge of the factual matter set forth in the foregoing Complaint; that to the best of my knowledge those matters are true and correct; and that I would competently testify to those same matters if called upon to do so.

10/19/18

~~Michael Martell~~
CHRISTOPHER MICHAEL MARTELL

Dated: October 16, 2018
Scarborough, Maine

36

State of Maine, County of Cumberland
The foregoing instrument was acknowledged before me
this 19 day of October 2018
by Christopher Michell Martell
signed _____
GREGORY S. ABBOTT. NOTARY PUBLIC. STATE OF MAINE
My commission expires _____

Gregory S. Abbott
Notary Public
State of Maine
My Commission Expires January 29, 2025